## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

```
_____
                                   )
BOSTON REDEVELOPMENT AUTHORITY,    )
           Plaintiff,              )
                                   )   Civil Action No. 14-12990-PBS
           v.                      )
                                   )
NATIONAL PARK SERVICE and          )
SALLY JEWELL, as Secretary of      )
the Interior,                      )
           Defendants.             )
_____)
```

## MEMORANDUM AND ORDER

August 26, 2015

Saris, U.S.D.J.

Plaintiff Boston Redevelopment Authority (BRA) is the owner of Long Wharf Pavilion, an open-air structure built in 1988 on Long Wharf in Boston Harbor. BRA seeks to convert Long Wharf Pavilion into a restaurant. But the National Park Service (NPS) insists that the pavilion is protected because of a federal grant awarded to BRA from the Land and Water Conservation Fund (LWCF) in 1981. In support of its position, NPS relies on a map of Long Wharf in its records dated March 27, 1980. BRA now challenges NPS's reliance on this 1980 map under the LWCF Act, Administrative Procedure Act (APA), Declaratory Judgment Act, and the judicial estoppel doctrine. The parties have filed cross-motions for summary judgment. (Docket Nos. 35, 46). After a hearing and review of the record, Plaintiff's Motion for Summary

1

Judgment (Docket No. 46) is **DENIED**. Defendants' Motion for
Summary Judgment (Docket No. 35) is **ALLOWED**.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In 1965, Congress passed the Land and Water Conservation
Fund Act (LWCF Act), which established a funding source for state
and local governments to plan, purchase, and develop public
outdoor recreation spaces. In exchange for the funding, state and
local governments agree to the following restriction under
Section 6(f)(3) of the LWCF Act:

> No property acquired or developed with assistance under this
> section shall, without the approval of the Secretary, be
> converted to other than public outdoor recreation use.

54 U.S.C. § 200305(f)(3). LWCF applicants must submit a "project
boundary map" as part of their grant application to establish the
area that will be protected by Section 6(f). (AR 604); Docket No.
45 ¶¶ 15-17. NPS then reviews and approves this so-called "6(f)
restricted area" before awarding the grant.

This case concerns the boundaries of the 6(f) restricted
area at Boston's Long Wharf. Specifically, the question presented
is whether an open-air structure known as Long Wharf Pavilion
falls within the restricted area. Plaintiff Boston Redevelopment
Authority (BRA) applied for funding from the LWCF in 1980. BRA's
application, dated March 24, 1980, stated that the proposed
project was the "first phase reconstruction of Long Wharf and the
construction of a portion of a Long Wharf Park by the Boston

Redevelopment Authority." (AR 6). A fifteen-page narrative in the application further described the project as: (1) repairing and rebuilding Long Wharf's granite seawall; (2) repairing and rebuilding the wood piling and decking around the perimeter of Long Wharf; and (3) construction of new pavement and platforms, with a park and public open space on the seaward end of the wharf. (AR 14-15). NPS's records include a map of Long Wharf titled "PROJECT AREA MAP" and a matching "METES AND BOUNDS DESCRIPTION." (AR 56-57). Based on this map, almost all of Long Wharf is designated as "TOTAL PARK PROJECT AREA." Additionally, the seaward tip of the wharf is designated "PHASE I - PARK AREA." A notation on this map reads: "6f boundary map 3/27/80."

BRA's application for a LWCF grant was a two-step process. BRA first submitted its application to the Massachusetts Division of Conservation Services (DCS), which is the state agency responsible for reviewing LWCF proposals and performing on-site inspections. After approving BRA's application, DCS then forwarded it to NPS, which administers the LWCF program on behalf of the U.S. Department of the Interior.[1] NPS awarded the grant to BRA in May 1981.

Relevant here, a public open-air structure on the seaward tip of Long Wharf was also part of BRA's redevelopment efforts.

---

[1] To be precise, the application was sent to the Heritage Conservation and Recreation Service, a federal agency later absorbed by the National Park Service.

Shortly after the LWCF grant was approved, the Massachusetts Bay Transportation Authority (MBTA) approached BRA about funding and building the structure if it included an emergency stairwell and ventilation shaft for the MBTA subway tunnel underneath. The MBTA also requested easements for maintenance and emergency egress. In 1983, BRA requested permission from NPS before moving forward, mindful of a potential violation of the 6(f) restricted area. (AR 182-85). NPS found that the project would not constitute a conversion of any 6(f) restricted area and approved the construction of the structure. It reasoned:

> It is apparent from the documentation submitted that the easements will not have a significant impact upon the recreational utility of the wharf and recreation opportunity will be increased by the addition of the pavilion which will provide shade and protection from the weather on the otherwise open facility.

(AR 182). In 1988, the MBTA completed the structure today known as Long Wharf Pavilion.

Fast-forward twenty years. In 2006, BRA began exploring the possibility of converting Long Wharf Pavilion into a restaurant. BRA issued a Request for Proposal to developers and obtained a construction license from the Massachusetts Department of Environmental Protection. This is when the Long War for Long Wharf began. Concerned Boston residents contacted NPS headquarters, asking about potential LWCF restrictions on the pavilion. (AR 277-82). NPS forwarded these questions to DCS, where a state employee found in its records a 1983 map of Long

4

Wharf with "Long Wharf 6-F" in red handwriting. (AR 297). Based on this map, DCS e-mailed NPS in February 2009 and stated that Long Wharf Pavilion was not located in the 6(f) restricted area. An NPS employee in Philadelphia replied via e-mail that he concurred with DCS's findings. (AR 277). As a result, DCS informed BRA and the Massachusetts Department of Environmental Protection that it could move forward with converting Long Wharf Pavilion into a restaurant, assuming certain minor accommodations.[2] (AR 284).

But that is not the end of the story. In 2012, NPS changed its position after being contacted by two retired NPS employees. The employees had read an article about citizens appealing the Department of Environmental Protection's decision to issue BRA its construction license. They then contacted NPS, recalling that the Long Wharf Pavilion was inside the 6(f) restricted area established by the 1981 LWCF grant. In response, NPS asked DCS to send over the 1983 map from its file. NPS also dug into its own records and uncovered the 1980 map. (AR 288-96). It saw the notation on the map: "6f boundary map 3/27/80." It also found the metes and bounds description of the project area. Based on these documents, NPS changed its mind in December 2012 and found that Long Wharf Pavilion was part of the 6(f) restricted area. (AR

---

[2]Not at issue here, this included a slight adjustment to the boundaries of the proposed restaurant so that it would not encroach on the 6(f) restricted area as outlined in the 1983 map.

301). An NPS official stated: "The darken shaded area associated
with the Phase I proposed development at this site is the limit
of the 6(f) boundary area." (AR 301).

BRA met with NPS at Boston City Hall in April 2014 to
convince NPS that it should rely on the 1983 map instead of the
1980 map. But BRA was unsuccessful. (Docket No. 58-3:49). NPS
issued its final decision in June 2014, reiterating that "the map
dated March 27, 1980 is the original Section 6(f)(3) map." (AR
303). BRA now challenges the decision under the LWCF Act, APA,
Declaratory Judgment Act, and the judicial estoppel doctrine.

## II. DISCUSSION

BRA argues that Long Wharf Pavilion does not fall into the
6(f) restricted area established by the 1981 LWCF grant for two
reasons: (1) NPS's decision to rely on the 1980 map to define the
6(f) restricted area is arbitrary, capricious, not in accordance
with law, or without observance of procedure required by law; and
(2) NPS should be judicially estopped from relying on the 1980
map after initially taking the position in 2009 that the Long
Wharf Pavilion did not fall into the 6(f) restricted area. Both
of these arguments miss the mark.

## A. Declaratory Judgment and Violations of the LWCF Act and Administrative Procedure Act (Counts 1, 3, and 4)

The first issue is whether NPS violated the APA when it
concluded that Long Wharf Pavilion falls into the 6(f) restricted
area. BRA argues that: (1) the parties never agreed to the 1980

6

map defining the 6(f) restricted area; (2) the 6(f) restricted area in the 1980 map is inconsistent with other documents in NPS's records; (3) many areas in NPS's alleged 6(f) restricted area have been used for purely commercial purposes since 1980; (4) NPS has taken different positions regarding the scope of the 6(f) restricted area; (5) BRA did not have the authority to assent to the expansive 6(f) restricted area listed in the 1980 map; (6) the 1980 map did not conform to the requirements set forth in the LWCF manual; and (7) NPS would have discovered the flaws in the 1980 map if it had properly conducted closeout procedures when the Long Wharf grant was closed in 1986. But none of these attacks on NPS's decision succeed.

The appropriate scope of review is set forth in the Administrative Procedure Act (APA). Under the APA, courts may set aside agency actions, findings, and conclusions if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2). An agency decision fails this test "if the agency relies on improper factors, failed to consider pertinent aspects of the problem, offered a rationale contradicting the evidence before it, or reached a conclusion so implausible that it cannot be attributed to a difference of opinion or the application of agency expertise." Massachusetts v. U.S. Nuclear Regulatory Comm'n, 708 F.3d 63, 73 (1st Cir. 2013) (quotation marks omitted).

7

Ordinarily, APA review is limited to the administrative record. Lovgren v. Locke, 701 F.3d 5, 20 (1st Cir. 2012); see also Liston v. Unum Corp. Officer Severance Plan, 330 F.3d 19, 23 (1st Cir. 2003) ("[H]ow could an administrator act unreasonably by ignoring information never presented to it?"). Nevertheless, "[t]he fact that review sometimes or often focuses on the initial administrative record does not mean it must, or always, will do so." Valley Citizens for a Safe Env't v. Aldridge, 886 F.2d 458, 460 (1st Cir. 1989) (Breyer, J.). For example, the Court may supplement the record when there is a "strong showing of bad faith or improper behavior by agency decision makers." Town of Winthrop v. F.A.A., 535 F.3d 1, 14 (1st Cir. 2008). Courts have also suggested that limited discovery may be necessary when a plaintiff shows that it will find material in the agency's possession indicative of an incomplete record. See Air Transp. Ass'n of Am., Inc. v. Nat'l Mediation Bd., 663 F.3d 476, 487-88 (D.C. Cir. 2011). Alternatively, supplementation of the record may be permissible when there is "a failure to explain administrative action as to frustrate effective judicial review." Olsen v. United States, 414 F.3d 144, 155-56 (1st Cir. 2005) (quoting Camp v. Pitts, 411 U.S. 138, 142-43 (1973)). Both parties took depositions relating to whether the 1980 map in the NPS files was submitted in connection with BRA's 1981 grant application. Although the depositions were not part of the

8

administrative record, the parties jointly urge the Court to consider the depositions on the question of whether the 1980 boundary map was improperly included in NPS's records, and whether the 1983 map was the true 6(f) map of record.

BRA suggests that the Court can review evidence outside the administrative record under the Declaratory Judgment Act. But this is wrong. The Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202 "does not itself confer subject matter jurisdiction, but rather, makes available an added anodyne for disputes that come within the federal courts' jurisdiction on some other basis." Ernst & Young v. Depositors Econ. Prot. Corp., 45 F.3d 530, 534 (1st Cir. 1995); see also Tyler v. Michaels Stores, Inc., 840 F. Supp. 2d 438, 452 (D. Mass. 2012)(explaining that "dismissal of the underlying claims requires dismissal of the claim for declaratory relief as well"). NPS issued an adjudicatory decision in June 2014 after reviewing its record and providing BRA an opportunity to respond at a meeting. As a result, the Court will review NPS's decision under the APA to determine whether it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2); see also Butte Cty. v. Hogen, 613 F.3d 190, 194 (D.C. Cir. 2010) (explaining that informal agency adjudication is subject to judicial review under § 706 of the APA). The Court declines to act as an initial

decision-maker and exercise <u>de novo</u> review.[3]

Because APA review is deferential and narrow, the First Circuit has observed that the summary judgment rubric has a "special twist in the administrative law context." <u>Assoc. Fisheries of Maine, Inc. v. Daley</u>, 127 F.3d 104, 109 (1st Cir. 1997). The "real question" is "whether the administrative record, now closed, reflects a sufficient dispute concerning the factual predicate on which [the agency] relied . . . to support a finding that the agency acted arbitrarily or capriciously." <u>Mass. Dep't of Pub. Welfare v. Sec'y of Agric.</u>, 984 F.2d 514, 526 (1st Cir. 1993). "Because the APA standard affords great deference to agency decisionmaking and because the Secretary's action is presumed valid, judicial review, even at the summary judgment stage, is narrow." <u>Assoc. Fisheries</u>, 127 F.3d at 109. Applying this deferential standard, the Court concludes that BRA's challenges to NPS's decision fall short.

1. The 1980 Map

For starters, BRA denies that it ever submitted the 1980 map

---

[3]BRA also submitted a motion for leave to submit a post-hearing brief, where it argued for the first time that the Court could determine the rights of the parties in the first instance. Alternatively, BRA suggested that the APA allowed the court to invoke its equitable powers and treat the case as a breach of contract action. The Court denied BRA's motion as untimely (Docket No. 67). In its initial memorandum, BRA had argued that the appropriate standard of review was set forth in the APA. <u>See</u> Docket No. 44:7 ("The LWCF does not provide for its own standard of review; therefore, the appropriate scope of review is the standard set forth in the APA").

as part of its LWCF grant application or intended the map to outline the 6(f) boundary. Instead, BRA insists that NPS mistakenly decided to treat the 1980 map as the 6(f) boundary map without a meeting of the minds. BRA also argues that this mistake was unreasonable because the 1980 map was inconsistent with other documents in NPS's records. But these arguments ignore the ample evidence to the contrary.

To investigate BRA's concerns regarding the 1980 map, the parties conducted limited discovery into the map's origins.[4] But even viewing the facts in the light most favorable to BRA, there is no evidence that NPS engaged in improper behavior by fabricating or mislabeling the 1980 map or otherwise relied on it in bad faith or by mistake. To the contrary, discovery showed that BRA had several maps of Long Wharf in its records that looked quite similar to the 1980 map. Former DCS employee Joel Lerner also testified that he recalled receiving the 1980 boundary map and the Metes and Bounds description from BRA and sending it on to NPS with BRA's grant application. (Docket No. 45 ¶¶ 72-73, 75). Similarly, former NPS employee Andrew Minarcik stated that he was initially assigned to review BRA's LWCF grant and wrote the notation: "6f boundary map 3/27/80." (Docket No. 45

---

[4]At the hearing, the Court indicated its willingness to remand the case back to NPS to see if the agency would change its position in light of the evidence unearthed in discovery. Both parties declined.

¶ 37). These facts establish that the 1980 map was created by BRA and received by NPS as part of the Long Wharf LWCF grant application.

The evidence in the administrative record further alleviates any uncertainties about the 1980 map's provenance. The 1980 map was labeled "PROJECT AREA MAP," which is consistent with the LWCF Grant Manual in effect at the time. See AR 604 ("The area to be included under the conversion provisions of Section 6(f)(3) of the Fund Act and Manual Part 685 shall be clearly delineated on a dated project boundary map to be included with each application or element in a consolidated project." (emphasis added)). The map was also submitted with a metes and bounds description that was consistent with the map and with the requirements of the LWCF Grant Manual. See AR 604-05 (instructing that the lands afforded Section 6(f)(3) protection could be identified by metes and bounds). BRA does not point to any maps existing in 1980 in NPS, BRA, or DCS's files that meet all of the LWCF Grant Manual requirements. Further, none of the other maps or pictures submitted with BRA's 1980 grant application come even close to satisfying the requirements of a 6(f) project boundary map. There is also no evidence in the record that the 6(f) boundary was ever formally amended.[5] (Docket No. 45 ¶ 45). And it is highly

---

[5]There were two amendments to the project, neither of which are relevant here. NPS and DCS amended the end date of the grant in February 1985. They also amended the project's scope to

unlikely that NPS employees would have approved of BRA's grant application and checked off the boxes for "Boundary Map" and "Adequacy of 6(f) area" without a 6(f) boundary map like the 1980 map in the application. See 36 C.F.R. § 59.3(a) ("Section 6(f)(3) of the L&WCF Act is the cornerstone of Federal compliance efforts to ensure that the Federal investments in L&WCF assistance are being maintained in public outdoor recreation use.").[6]

The project narrative that BRA submitted with its grant application confirms that the 1980 map was BRA's proposal for the 6(f) boundary. BRA's narrative states that the "project area as shown on 'Project Area Map', includes Long Wharf, the public area around the Waterfront Hotel, and the small stretch of waterfront between Long and Central Wharves." (AR 15). According to the narrative, the LWCF funds would also be used to rebuild wooden decks "along the northern, eastern and a section of the southern edge as shown on the attached plan." These references to the "Project Area Map" and wharf decks on the "attached plan" perfectly match up with the 1980 map but not with any other

---

exclude construction of perimeter wood docking and walkways in November 1986.

[6]BRA also appears to argue that NPS waived its right to use the 6(f) boundaries in the 1980 map because its map did not satisfy every requirement of the LWCF grant manual. But BRA provides no authority to support this bare assertion. See Wood v. Milyard, 132 S. Ct. 1826, 1835 (2012) ("Waiver is the intentional relinquishment or abandonment of a known right."). At most, NPS waived its right to require BRA to submit a map meeting every requirement of the LWCF grant manual.

pictures or maps from BRA's application. More to the point, the narrative states that the project would use LWCF funds to build a park at the "eastern end of the wharf" as shown on the "attached plan." (AR 16). This proposed park matches up with a dark shaded area in the 1980 map labeled "PHASE I - PARK AREA" covering the entire eastern end of Long Wharf, including the area currently inhabited by Long Wharf Pavilion. Nowhere in these documents does it indicate that the area of the wharf occupied by Long Wharf Pavilion would be excluded from the 6(f) boundary. Rather, the documents show that BRA proposed to use LWCF funds to redevelop Long Wharf generally, including the construction of a park on the eastern end of the dock.

To put any doubts to rest, the record shows that DCS re-submitted the 1980 map and the metes and bounds description when it sought NPS's approval in 1983 for MBTA to build Long Wharf Pavilion. Looking back, this submission was telling in two ways. First, it is evidence of BRA and DCS's understanding that the 1980 map depicted the official boundaries of the 6(f) restricted area, certainly with respect to the "PHASE I - PARK AREA." Second, it also shows BRA's understanding in 1983 that the MBTA could not begin building the ventilation shafts and emergency access in Long Wharf Pavilion without NPS's consent. Especially given the deferential standard of review, BRA has not shown that it was arbitrary or capricious for NPS to rely on these factors

14

to conclude that the 1980 map contained the official 6(f) boundaries. See <u>M/V Cape Ann v. United States</u>, 199 F.3d 61, 64 (1st Cir. 1999) ("So long as the agency's determination is within the bounds of reasoned decisionmaking, we may not set it aside, regardless of whether we may have reached an opposite decision." (quoting <u>Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.</u>, 462 U.S. 87, 105-06 (1983)).

BRA responds that several parts of the record refer to a park of only about 20,000 square feet, including the project narrative, pre-award on-site inspection report, and a press release issued by NPS. BRA also points out that it submitted a map to the Advisory Council on Historic Preservation in 1979 that appears to limit the "PROPOSED DOCKSIDE PARK" to only the southeastern portion of the wharf. These statements are accurate reflections of the record. But the park at the seaward tip of Long Wharf was just one part of the overall intended LWCF project that included: (1) repairing and rebuilding Long Wharf's granite seawall; (2) repairing and rebuilding the wood piling and decking around the northern, eastern, and southern edges of Long Wharf; and (3) construction of new pavement and platforms, with a park and public open space on the seaward end of the wharf. In other words, BRA was seeking money for much more than just a park. At the time it applied for LWCF funding, BRA also wanted to rebuild the wooden decks and make other structural repairs and

15

improvements to the wharf. For this reason, it makes sense that BRA's proposed 6(f) restricted area extended beyond the park at least to other seaward parts of Long Wharf that benefitted from LWCF funding.

BRA also points to the 1981 project agreement between the United States and Massachusetts, which required NPS to perform the agreement in accordance with "maps . . . attached hereto or retained by the State and hereby made a part hereof." (A.R. 45) (emphasis added). Because the only map labeled "6(f) boundary map" in Massachusetts's records is the 1983 map, BRA argues that the 1983 map must govern. But BRA's reliance on this contract language is unavailing. For starters, the agreement recognizes that maps can be "attached hereto" rather than "retained by the State." True to this language, the project agreement states at the bottom of the first page that the "Project Application and Attachments" are incorporated into the agreement. As a result, NPS reasonably concluded that the 1980 boundary map was part of BRA's application and therefore incorporated into the contract. Also, BRA ignores that the agreement only refers to maps "retained by the State and hereby made a part hereof." Given that the agreement was signed in May 1981, there is no way that the 1983 map could have been "hereby made a part hereof" when it did not even exist yet. As a result, the project agreement between the United States and Massachusetts only further strengthens

NPS's reliance on the 1980 map.

2. Whether Commercial Portions of Long Wharf Could be
Included in the 6(f) Boundary

BRA next appeals to reason. Back in 1981, BRA says it would
have been nonsensical to earmark the entirety of Long Wharf for
public outdoor recreation-as the 1980 map indicates-when certain
parts of Long Wharf were historically used for commercial
purposes. For example, Long Wharf in 1980 was used principally as
a docking facility for charter fishing boats, vessels belonging
to various municipal and regional policing agencies, and
excursion boats to Boston Harbor, the Boston Harbor Islands, and
Provincetown. Long Wharf also had a ticket booth, a parking lot,
and a concession stand. (AR 11). Along these same lines, BRA says
that it would have lacked the authority to agree to 6(f)
restrictions on the commercial portions of Long Wharf. In support
of this argument, BRA quotes from DCS's 1979 Pre-Award On-Site
Inspection Report, which states:

> The future of the area north of the park (including some of
> the proposed walkways) is still uncertain. The Boston
> Redevelopment Authority has offered a couple of alternatives:
> a marina and/or commercial cruise and commuter ferry docking
> sites. Since definite plans for this area have not been
> developed, it is not known whether this section of the wharf
> is eligible for funding by the Land and Water Conservation
> Fund.

(Docket No. 38-6:4). BRA argues that this "area north of the
park" that DCS thought might be ineligible for LWCF funding is
the land now occupied by Long Wharf Pavilion. BRA also points to

17

a January 1981 letter stating that BRA was planning to build a ferry terminal at Long Wharf that would not be a part of the LWCF project.

But these selected quotations from NPS's records are not dispositive. For one thing, it is not obvious that BRA's documents are even talking about the area now occupied by Long Wharf Pavilion. The 1980 map and narrative both indicate that BRA planned to build a park on the seaward end of the wharf. There was no carve-out for the area now occupied by Long Wharf Pavilion.

In any event, courts have held that commercial structures can aid public outdoor recreation by "adding to the scenic character of the park." Brooklyn Heights Ass'n, Inc. v. Nat'l Park Serv., 777 F. Supp. 2d 424, 441 (E.D.N.Y. 2011) (holding that a Tobacco Warehouse and Empire Stores building could be part of a 6(f) boundary because "the intended use of the structures is not relevant, much less controlling"); cf. Friends of the Shawangunks, Inc. v. Clark, 754 F.2d 446, 449 (2d Cir. 1985) (holding that the term "public outdoor recreation use" for purposes of LWCF Section 6(f)(3) should be construed "broadly"). Similarly, BRA's application stated that building and remodeling boat terminals on Long Wharf would provide the public with continuing access and exposure to the harbor and the Boston Harbor Islands Park System. (AR 18). Thus, these terminals served

18

an important public outdoor recreation use, even if they also had commercial utility. The LWCF Grant Manual in effect in 1981 was consistent with this view, allowing LWCF assistance for boating facilities and marinas. See AR 401 ("Commercial charter fishing or sightseeing boats are permissible marina leaseholders due to their potential for expanding public waterfront access.").

    3. NPS's Changing Views

    BRA next argues that NPS acted arbitrary and capriciously when it changed its mind, allowing the restaurant project to proceed before rejecting it. Essentially, BRA suggests that NPS cannot reconsider its decisions even after discovering a mistake. But this is not the law. It is well-established that "an agency, may, on its own initiative, reconsider its interim or even its final decisions, regardless of whether the applicable statute and agency regulations expressly provide for such review." Chao v. Russell P. Le Vrois Builder, Inc., 219 F.3d 219, 230 (2d Cir. 2002) (collecting cases); cf. R.I. Dep't of Envtl. Mgmt. v. United States, 304 F.3d 31, 40 (1st Cir. 2002) (explaining that the APA's finality requirement gives the agency an opportunity to "apply its expertise and correct its mistakes"). Beyond that, courts have found agencies to be arbitrary and capricious when they chose not to reconsider their position after being alerted to a potential mistake. See I.C.C. v. Bhd. of Locomotive Eng'rs., 482 U.S. 270, 278 (1987) (explaining that an agency's refusal to

19

reopen a proceeding can be arbitrary, capricious, and an abuse of discretion); Kreis v. Sec'y of Air Force, 406 F.3d 684, 688 (D.C. Cir. 2005) ("[T]he Board's conclusion that reconsideration was not authorized on the basis of newly discovered relevant evidence was arbitrary and capricious."). Granted, there could be a problem if NPS unilaterally changed the 6(f) restricted area without proper notice and procedure. But that is not what happened here. NPS merely realized that its earlier position was mistaken in light of newly discovered evidence from former NPS employees who had familiarity with the 6(f) boundaries established in BRA's 1981 grant application.[7] It also notified the BRA and had a meeting for interested stakeholders to present information.

**B. Judicial Estoppel (Count 2)**

BRA next invokes the doctrine of judicial estoppel, arguing that NPS should not be allowed to reverse course after telling the Massachusetts Department of Environmental Protection in 2009 that the Long Wharf Pavilion was not part of a 6(f) restricted

---

[7]BRA also argues that NPS failed to properly conduct a "close-out" process of the Long Wharf LWCF grant in 1986, which would have possibly exposed the confusion between the 1980 map and the 1983 map earlier. Even if this were true, BRA does not explain why this means that NPS has surrendered LWCF protection over Long Wharf Pavilion. This argument is waived. "It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones." United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

area. These representations later became part of the record before the Massachusetts Office of Appeals and Dispute Resolution and the Massachusetts Superior Court when citizens challenged the issuance of the license under the Massachusetts Constitution. See Mahajan v. Dep't of Envtl. Prot., 984 N.E.2d 821 (Mass. 2013).

The Supreme Court has explained that "judicial estoppel is an equitable doctrine invoked by a court at its discretion." New Hampshire v. Maine, 532 U.S. 742, 750 (2001). The judge-made doctrine "prevents a litigant from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." Thore v. Howe, 466 F.3d 173, 181 (1st Cir. 2006) (quotation marks omitted). At a minimum, two conditions must be satisfied before judicial estoppel can attach. First, a party must be taking positions that are "directly inconsistent, that is, mutually exclusive." Alt. Sys. Concepts, Inc. v. Synopsys, Inc., 374 F.3d 23, 33 (1st Cir. 2004). Second, the responsible party must have "succeeded in persuading a court to accept its prior position." Id. Courts also frequently consider a third factor: "whether judicial acceptance of a party's initial position conferred a benefit on that party." Id.; see also InterGen N.V. v. Grina, 344 F.3d 134, 144 (1st Cir. 2003) (declining to invoke judicial estoppel where the party gained "absolutely no advantage" from changing positions).

It is also "well settled that the Government may not be

estopped on the same terms as any other litigant." Heckler v. Cmty. Health Servs. of Crawford Cty., Inc., 467 U.S. 51, 61 (1984). The First Circuit has "repeatedly refused to apply estoppel against the government in ordinary situations where a private party would or might have been estopped." Nagle v. Acton-Boxborough Reg'l Sch. Dist., 576 F.3d 1, 4 (1st Cir. 2009) (collecting cases). For example, the First Circuit has rejected "a broad rule that prevents the sovereign from enforcing valid laws for no better reason than that a government official has performed his enforcement duties negligently." Dantran, Inc. v. U.S. Dep't of Labor, 171 F.3d 58, 66 (1st Cir. 1999). The reluctance to permit estoppel against the United States is based on "a concern for the public purse and a recognition that the government-unlike the normal actor-is an enterprise so vast and complex as to preclude perfect consistency." Howell v. F.D.I.C., 986 F.2d 569, 575 (1st Cir. 1993). Additionally, it would raise potential separation-of-powers concerns if the judiciary were to use a judge-made doctrine like judicial estoppel to prevent the Executive Branch from enforcing laws enacted by Congress. Dantran, 171 F.3d at 66.

With these principles in mind, the Court declines to exercise judicial estoppel here against NPS. There is no dispute that NPS took two mutually exclusive positions, one before the Massachusetts Department of Environmental Protection and a

different one here. The Court will also assume for the sake of argument that NPS "succeeded"[8] in persuading a "court"[9] by its earlier statements. But despite the presence of these two factors, there are several meaningful reasons why judicial estoppel is not appropriate here.

First, NPS was not harbor-ing any bad faith when it changed positions regarding Long Wharf. When NPS was first asked to decide whether BRA could convert the Long Wharf Pavilion into a restaurant, nobody at NPS was aware of information concerning the specific boundaries of the restricted area established decades earlier. As a result, NPS understandably deferred to DCS's opinion, which was in part based on a map in its records from 1983. After two retired NPS employees alerted NPS that their memory differed, however, the agency conducted further

---

[8]Relying in part on NPS's statements, the Massachusetts Department of Environmental Protection issued a license to BRA. But Massachusetts citizens challenged the license before the Office of Appeals and Dispute Resolution, Massachusetts Superior Court, and the Massachusetts Supreme Judicial Court (SJC). After the SJC reversed the Superior Court, Massachusetts citizens alerted the Superior Court of NPS's new position regarding the 6(f) restricted area. As a result, the previous license was vacated, and proceedings are currently stayed before the Office of Appeals and Dispute Resolution.

[9]The parties do not discuss in any detail whether the Massachusetts Department of Environmental Protection should be considered a "court" for purposes of judicial estoppel. Nor do the parties discuss whether the Superior Court's reliance on the record from the Massachusetts Department of Environmental Protection would constitute persuasion of a court for purposes of judicial estoppel.

investigation and changed its position. See Intergen N.V., 344
F.3d at 144 (refusing to bar parties from adjusting their
position to "correct errors or to accommodate facts learned
during pretrial discovery"). The Court recognizes that NPS could
have-and should have-looked more carefully through its own
records at the outset rather than simply rely on the state
agency's say-so. Nevertheless, the Court finds that NPS changed
its position in good faith after realizing a mistake. This is far
from the paradigmatic case for judicial estoppel where a crafty
litigant takes one calculated position early on in the litigation
and then adroitly flip-flops to another when expedient. Quite to
the contrary, NPS's earlier position disadvantaged the government
by surrendering Long Wharf Pavilion's LWCF protections. See id.
(explaining that judicial estoppel is appropriate when a litigant
is "playing fast and loose with the courts" and not otherwise).
As a result, the Court is not inclined to punish NPS for its good
faith mistake.

Second, the Court also respects the historic judicial
reluctance to estop the Executive from enforcing laws duly
enacted by Congress. Especially in the circumstances of this
case, judicial estoppel would not merely affect BRA and NPS.
Rather, NPS is responsible for enforcing LWCF restrictions that
preserve outdoor recreational spaces for the benefit of the
public at large. Further, the record shows that NPS's change in

position is primarily because of over-reliance on a state official's research and inadequate investigation of the federal file. See Dantran, 171 F.3d at 66 (rejecting rule that prevents the sovereign from enforcing valid laws merely because a government official has performed his enforcement duties negligently). As a result, the Court declines to force NPS to forfeit a significant land interest held for the public based on NPS's negligence and a judge-made discretionary doctrine. For these reasons, the Court will also allow NPS's motion for summary judgment and deny BRA's motion for summary judgment on Count 2.

## C. Post-Script

At the hearing, BRA suggested that adopting the 1980 map places many other commercial establishments built on Long Wharf in jeopardy. NPS also appeared to agree that some commercial establishments might need to be shut down under the 1980 boundary map. To be clear, the Court's ruling today only upholds NPS's finding that Long Wharf Pavilion falls into the 6(f) restricted area at Long Wharf. The Court does not consider whether other commercial establishments on Long Wharf also fall into the 6(f) restricted area, especially those that fall into the "TOTAL PARK PROJECT AREA" but not the "PHASE I - PARK AREA" in the 1980 map. (AR 56). Long Wharf Pavilion falls within both boundaries. Nor does the Court consider whether currently existing commercial establishments would be entitled to affirmative defenses like

laches, estoppel, adverse possession, or lack of due process.

**D. Exhibits**

Exhibit A - Map in NPS's records dated March 27, 1980 (AR 56)

Exhibit B - Map in DCS's records from 1983 (AR 297)

### III. ORDER

Plaintiff's Motion for Summary Judgment (Docket No. 46) is

**DENIED**. Defendants' Motion for Summary Judgment (Docket No. 35)

is **ALLOWED**.

　　　　　　　　　　 /s/ PATTI B. SARIS
　　　　　　　　　　Patti B. Saris
　　　　　　　　　　Chief United States District Judge

# EXHIBIT A



TOTAL PARK PROJECT AREA

PHASE I - PARK AREA

OLD FOUNDATION

CLARKE HOUSE

CUSTOM HOUSE BLOCK

PROJECT AREA MAP
LONG WHARF

615' ±

150' ±

85' ±

6 5 boundary map

3/27/80

A.R.056

NPS1935

# EXHIBIT B



A.R 297

NPS2192